Page 3 We'll hear first from Mr. Munford whenever they get up here. May it please the Court, I am Luther Munford with the Butler Snow Firm in Jacksonville, Mississippi. With me at council table is Chris Schwing of the Holland and Knight Firm in Florida. We're here on behalf of three Mississippi electric cooperatives with a somewhat ironic purpose. We want jurisdiction in federal court so that we can be protected in our efforts to reduce our dependence on a federal program. Let me explain that. The question was asked to the earlier council, what's the underlying dispute about? The simplest way to describe this dispute is to look at a balance sheet from one of the cooperatives. There is one at page 903 of the Dixie and Willis record. And on the right hand of that balance sheet there are two things. There's equity and there's debt. All of the equity is something known as patronage capital. The associations consistent with federal and congressional policy want to increase or at least maintain patronage capital so they can avoid debt and hopefully get to a position of financial strength where they would not require the assistance of the federal government being the lender of last resort. The plaintiffs, on the other hand, say that state law requires the payment of patronage capital to them or at least some portion of the patronage capital to them which would necessarily increase the percentage of federal debt, increase the interest costs of the association. And they want to do that so that they can receive whatever the amount may be. In the case of Ms. Butler, I think the amount is something like $60 less whatever the contingent fee might be. The point is that we are trying to protect our ability to maintain and keep patronage capital consistent with the purpose of reducing our dependence on the federal government and not increasing it. With respect to the merits of the dispute, of course it's not before the court. We would say that the underlying Mississippi statute, 775-235, is not correctly quoted in the Appellee's brief at footnote 1. It says it's the 2016 version of the statute. It's not. If the court feels it's necessary to consider the statute, it should go to Westlaw for the current version and not their brief. Is there some difference that is applicable to this dispute? Yes. And what is that difference? The statute was amended in 2016 in a way that we say removes their claims entirely. They say that the statute before 2016 should be applied. Is that because it's the amount? No, it's . . . It's not related to that. Okay. The statute governs what these cooperative associations can do with their money. And the legislature put in language in 2016 that has been interpreted by courts in other jurisdictions to completely eliminate claims like this. Completely eliminate. Okay. But you also have even under the old statute that it's the amount of money that you're trying to keep, the amount of money being kept back is not the right or that's their argument? On the merits, one of our arguments is that these rights do not vest until the boards decide to pay the money out. That is consistent with federal tax law. It's consistent with a treatise-type document they have. Obviously, that's not for the court at this time. We think these claims are absolutely meritless, but in this particular dispute, we have a $200 million claim, so we have to treat it seriously. And how is being remanded to state court keep you from pursuing your noble goals that you've outlined earlier? I'm sorry? How does being remanded keep you from being able to pursue these goals? You said you have to be in federal court to be able to . . . Because Congress has provided for federal officer removal. But you can have these same claims in the state court as well, correct? The purpose of the federal officer removal statute is so that federal claims are tried in federal court. Right, but there's nothing . . . you're not barred in Mississippi from bringing these actions. Nobody's ever barred . . . I know. Well, sometimes . . . Raising federal claims in state court. Right, so there's . . . But Congress did pass a statute for federal officer . . . You'd prefer to be in federal court to raise your claims? Yes, we do. Okay. Yes, we do. The federal officer removal statute talks about action under color of office. The under color requirement has been given the shorthand of colorable defense. But to understand what that means, you have to look at the U.S. Supreme Court's decision in the Mesa case, where the court goes back to first cases and talks about what colorable defense has meant. And it certainly does not mean complete defense. And the language in Mesa talks about a federal question or claim to a federal right. If there be but a single element in the mass, it is sufficient. A contention that a federal statute, or we say regulation, does not impose obligations is sufficient. The raising of a federal question would be sufficient. And in fact, the example is given of a revenue agent that was charged with murder. His defense was self-defense. And that was said to raise a question because, not because being a federal revenue agent was a defense, but because his right to be on the property arose out of the fact that he was a federal agent. So the plaintiffs are just wrong when they say that it has to be a complete defense. It does not. The Mesa decision makes that very clear. This court in Savoy dealt with two claims. One was removable. The other was not. The court said it was still removable. And this court in the Bell case said, noted that some claims were outside the scope of the federal defense. So the question is, what do we have here? Well, if you look at 17-17-617, there's a limit on distributions, a limit on the distribution of patronage capital by these associations. And several provisions here are an issue. The first one is not greater than 30%. If the distribution would reduce equity below 30%, you have to get the permission of the federal government. Now, important, quote, preemption applies to any state claim that requires the defendant to get the permission or assistance of the federal government. I think the quote is, the question for impossibility is whether a private party could independently do under federal law what state law requires of it. And if you can't do it independently, then it's preempted by federal law. Is the 30% applicable here? Yes, because that is the underlying principle that applies. If you, if they, if the case would take, would reduce equity below 30%, then we would have to get the federal government's permission. The federal government would be knocking at our door saying, what's wrong with you? Does it reduce equity below 30%? What's, what's on the table here? And if you apply the normal rules for removal, absolutely yes. You look at the complaint at the time of removal. If this, compare it to diversity, if the complaint said at least $75,000, there's no question it would be removable. And if they came in with a stipulation, which they haven't done, you would say, well, one plaintiff can't stipulate for the 79,000 other people who are claiming on you here, apparently, or that they want to claim. So there's absolutely no reason why this complaint should be interpreted in any way other than seeking, seeking more than 50, more than 30%. The district court's fundamental error was it didn't look for a colorable defense. It looked for a colorable reason to find there was no defense. And that's just backwards. It's not the way colorable defense works and it's not the way removal works. They contend, you know, we're all, we're limited by this 30%. But they didn't, their prayer for relief does not limit them to $53 million. The next question, and, and, and equally important, is you can't, you have to have permission if the borrower goes into default. And the act of default is defined, and this is tab three, as the appointment of a receiver, a trustee, or similar official. Now, the district court read this to say this is all about bankruptcy. But that's not a fair reading of it, and in fact, the title, G, bankruptcy, which is in bold in the original, paragraph 9.1.1 says you don't interpret the contract by using those headings. And if there's any question about it, you go to the mortgage, which we've provided here, and the mortgage treats bankruptcy and receivership separately. There's no question that if you give meaning to this language and say all of this language has to have meaning. But there's no actual default here. They ask for the appointment of a receiver or trustee to administer this money. Just to administer money that exists, there's no default that's going to have to be, is there, counsel? If a court appointed a trustee, that would be an act of default, and no money could be paid unless the federal government gave permission to pay it. It's an absolute prohibition on what they're trying to do. Isn't it more like a special master or something to administer this rather than a trustee trying to figure out various claims that exceed the amount and you're trying to... They use the words receiver. They invoke a Mississippi trust statute and ask for a trustee. In fact, if you look at the complaint, it's hard to find a request for relief that is not preempted. First prayer relief, an amount equal to $53 million or such greater amount as determined by the court. That's number two. Number three, a constructive trust for $53 million. Number four, enjoin future violations by appointing an independent trustee or receiver. Number five, award attorney's fees, which of course would take it over the $53 million. They also have a prayer for punitive damages that would take it over the $53 million. Number six, ask for a trust. Number seven, ask for a trust. Number eight, ask for an accounting of all patronage capital accounts, not just some of them. And that's it. Those are their prayers for relief. And almost every one of them would bring them into default. Your Honor, the only other thing I have to tell you is the Tallahatchie case that they rely on. They rely on a Mississippi Tallahatchie case. And I regret to report the Mississippi Supreme Court misquoted a federal statute in a very material way. We give the statute in paragraph five. It says the congressional declaration of policy is that these associations should be assisted to develop their resources and ability to achieve the financial strength needed to enable them to satisfy their credit needs. That is an express delegation of policy. There are objections to obstacle preemption, but the objection is usually that Congress hasn't been specific. Congress has been very specific here. We are supposed to develop our resources and ability to achieve financial strength so that we don't have to depend on The only financial strength we have is patronage capital. These cases belong in federal court. Thank you, Counsel. And of course, the Third Circuit and Eleventh Circuit have agreed with our position. Mr. Berry? Yes, Your Honor. May it please the Court? Your Honors, my name is Brandon Berry. I'm with the law firm Cosmic Simmons and Brown out of Jackson. I represent the plaintiffs' appellees in this lawsuit. Despite a hundred pages of briefing and multiple supplemental letter briefs, the instant issue is a straightforward one. Whether the cooperatives have a colorable federal defense of conflict preemption with respect to my client's claims. It strikes me, Counsel, very unusual that this whole construction goes back to FDR's initial proclamation coming out of the Depression, followed by Congress's immediate reaffirmation of creating the Reconstruction Finance Corporation. All the financing, the structures of this came from the federal government, and Mississippi was a beneficiary of that so that they could gain rural electrification. And that's been the period over the years. If you look at the history of this thing, you'll find it very strange to find that suddenly when you seek to pull out the capital from this corporation, that there's not at least a colorable federal interest within the meaning of the officer removal statute. So I don't find this case close. So I'm going to take that straight away because it seems to me that to say that you could go and sue for punitive damages, ask for a receiver, a trust, a receiver would take over and marshal these claims, etc. It would be completely disruptive on the face of it to allow the state courts to do that. With respect to the receivership and the trustee arguments and the allegations in the complaint, we're only asking that a trustee, we're asking that it be set aside in a trust, a constructive trust or a statutory trust, and therefore the trustee just preside and preside over the recovery, not the operations of the assets of the cooperative. Well, if you were to take another look at what a receiver does in the ordinary course of this thing, taking over and marshaling claims themselves and making dispositions of them, I find your relief that you seek for it to run the teeth of the statute. I don't know what else to say about it. What about punitive damages? That was an allegation that was reserved. What does that mean? We didn't specifically plead for it. Wish you hadn't pled it. Well, we don't have any discovery, you know. I mean, it was just a complaint. So, again, it was just, it was reserved. As recognized by Judge Sterritt, colorable has not been defined within the context of the federal officer removal statute by the Supreme Court of the Fifth Circuit, but the Supreme Court has clarified that a non-colorable federal claim for the purposes of federal jurisdiction is a claim that is immaterial and made solely for the purposes of obtaining in this case is not colorable. It was asserted for the purposes of obtaining federal jurisdiction. And as this Court knows, conflict preemption occurs when you've got, when compliance with both state and federal law. Well, counsel, you, the federal government is lending this, this is federal dollars that are coming in there, and large amounts of money to make this operation go. So they effectively run a rate case, sort of straightforward kind of way, of allowing the, the, maintaining the insurance that, that you have enough money there to pay off the debt, et cetera, et cetera. So the government on the face of it has a large stake in the ability of this, this rural cooperative to continue to discharge their, their obligations on it, and the conditions that go with those loans that say that. They, they have a stake in it, and they, but they've made that stake clear, that the 30 percent is, is, is all the … So you would complain that it's not, can find itself at 30 percent. Not only that, the, the, the percentage in its applicability and, and the range of the damages are not some precisely determined number. And, and it's sufficient that the federal government has a right under the, given to them by Congress, I mean, here administering this program, to, to make decisions and, and about be able to participate in any, any decisions about a large withdrawal out of that. Once you come in there and say you want to take 50, 30, 40 million dollars out of this, out of this thing, and say, well, enrich the local patrons, whatever, but then, then doesn't that, doesn't the federal government have a right and an opportunity to participate in that? They didn't expressly say it. And, and … Well, they are doing it. They're saying we're going to, we won't, we, we're entitled under the statute to, to, to answer this in the federal court. Excuse me? They're entitled, they seek the protection of the federal court for the same kinds of reasons that we have diversity jurisdiction, you also have on the federal side. I, I, they, they do seek the, the, the protection of the federal court, I, I will agree. With respect to our claim, the, when Rez a whole, as, as Judge Sterik correctly ruled, it was, it was plainly drafted to avoid entanglement with these, these federal regulations and loan obligations. Are you limited to the 30% or not? We are. I mean, I believe that, that if the, the act, excuse me, I'm getting a little tongue-tied, it's my first time before the court, so I apologize, but if the equity to asset ratio were to fall below 30%, then that would be, that's where our complaint stops. Anything above that isn't contemplated by Congress or the RUS, and they could have specifically said that in these regulations they're citing. They could have specifically said that if they were worried about it. Our statute, 775-235 of the Mississippi Code, specifically contemplates everything that they're worried about, maintaining reasonable reserves, board discretion, paying, inability to pay their loans. And who's going to determine about, make the decision about ability to, to pay the loans under your scheme? The state court in Mississippi? Yes, Your Honor. Yes. Judge Sterik ruled that it wasn't physically impossible. He also ruled that it wasn't an obstacle to the purposes and objectives of Congress, which is what we've got to look to, because per well-established precedent, Supreme Court precedent, the RUS provided loan, the purpose of the RUS was to provide low-interest guaranteed loans for purposes of facilitating low-cost electricity to rural America. The cooperatives argue that requiring them to return excess revenues above the 30% regulatory threshold would remove board discretion, thereby creating an obstacle to the objectives and purposes of RUS. But this simply isn't true. 775-235 of the Mississippi Code gives the cooperatives express discretion and authority to designate reasonable reserves for improvements, for construction, for depreciation, and other contingencies. Amounts beyond those, not needed for these purposes, however, are excess. And these are non-profit, member-owned electric cooperatives that have hundreds of millions of dollars in excess. And the statute reads the way it reads for one simple reason. They're not regulated by the Public Service Commission. What's the amount of the debt? What's the amount of the debt? For whom? For the cooperative. I don't have that number right in front of me, Your Honor, but we're going to avoid it falling over. No one's focusing on that. You're taking out money. The question, when you start withdrawing these large amounts of money, is the ongoing ability and assurance of repayment of the loans itself. That's been the very structure of this from the very inception. And all that you're talking about here is whether that's going to be resolved in the state or federal court. And that's what it amounts to. Well, our statute specifically allows it. They can't. The relief requested by our clients will never put the cooperatives ever in a position whereby they will not be able to repay their federal loans. Well, if that's true, then the federal court can determine that also. I agree the federal court can determine that. I just want to get here the right way. Do you want to address the Eleventh and the Third Circuit and whether or not those cases are similar? Are we going to create a circuit split if we were to rule for you? You won't be departing from it because this case is interesting and different. As Judge Sterik correctly found, our complaint is limited to 30 percent, excess above the 30 percent equity to asset ratio, so as to avoid any entanglement with the RUS or any federal loan obligation. You're saying that yours is factually different, so it doesn't create any kind of circuit split. Yes, Your Honor. What do you do with the other side saying that it's really not limited to 30 percent? I would ask the court to take a helicopter view of this complaint. We're in Mississippi. We filed this complaint on no displeasing state, right? And if I may, the court's indulgence, as of the end of— I would like to read paragraph five and six of just one of these complaints, this one being Coast Electric. We say kind of right there at the outset, despite this requirement to return money as mandated by 775-235, Coast Electric Power Association has accumulated millions of dollars of revenue that it has failed to return to its members. As of the end of the 2016 calendar year, it held more than $158 million of its member rate payers' money. The Fifth Circuit has said it's member income. It's the Mississippi chemical case. And then paragraph six. It currently holds patronage capital equal to 45 percent of the assets. This number far exceeds that 30 percent asset-to-equity ratio. The amount of capital in excess of 30 percent amounts to nearly $53 million, and this amount should be refunded to its members. Moreover, as Judge Sterik correctly ruled in footnote one of his opinion remaining in this case back to state court, defendant argues that plaintiffs did not in fact limit their demand to funds in excess of 30 percent threshold, focusing on plaintiffs' demand of no less than $112 million. The court does not interpret the language to imply that plaintiffs seek funds beyond which is permitted by the regulatory safe harbor. Rather, plaintiffs want every cent above the regulatory threshold distributed to defendants' members. I want to go back to something. The Public Service Commission doesn't regulate these guys. So 775-235 operates just like it should. The board members, they set the rates. So if they're off by $0.10 kilowatt hour, at the end of the year it's supposed to go back to the members. That's why they don't have a public service. That's why they're not regulated by the Public Service Commission. They're a monopoly. They've got hundreds of millions of dollars in member income, member income that this court has called member income. And that really goes to the heart. Your Honor asked them, you asked kind of about the significance of the amendment. The 2016 amendment was clever. It was subtle, but it was clever. Before 2016, you didn't have an option. You had to reduce rates with this excess or you had to return fees. Now what do you get to do? Reduce rates or return member fees or guess what? Anything else unless the Board of Directors provides otherwise. It's an escape clause to allow them to use the money that they've accumulated over decades and decades, as they will. I've got six minutes left and I just want to conclude briefly. I think this is an important point. Given that it's quoted by the Supreme Court, the regulation of utilities is one of the most important functions traditionally associated with the police powers of the state, the regulation of utilities. It would be unfortunate to see the purposes and obstacles. Counsel, let me say, that is absolutely true. And the Congress of the United States in the Johnson Act makes it quite clear that in rate cases that there is no jurisdiction in Federal court because, for the reason that in a rate case, there is always a background Federal issue taking. That's what the rate cases are about. So the Congress has made it quite clear in those cases. But that's not the difficulty here. This is not a state regulatory. This is not a local power company, that kind of thing. This is not a state utility. It is a creature of the Congress. So when Congress dealt with those that were not creatures of the Congress, they made it quite clear in the Johnson Act that those rate cases stay in Federal court, despite the fact that the question in a rate case is always whether or not the rate returns the Fifth Amendment violation. So theoretically, those cases could have always been in Federal court. Congress said no. And I would make the distinction here that this isn't about rate making. Okay? This is about the disposition. I understand that. But I'm following up on your argument about local utilities. Yes, Your Honor. It's our position that it would just be unfortunate to see the purposes and obstacles of the RUS and Congress, the purposes of which were just to provide low-interest guaranteed loans to cooperatives, to expand beyond what is merely derivative of receiving such funds and to the point of depriving a cooperative of excess revenues and receipts accumulated by a nonprofit member-owned public utility that was incorporated in Mississippi, organized in Mississippi under Mississippi law, and who provides electric services to citizens of Mississippi in Mississippi, especially when the very law that they allege to be in conflict with all these regulations and loan covenants specifically contemplates reasonable board discretion and reasonable working reserves. I'll end with the following, as stated by the Honorable Jones in her dissent in the per curiam opinion denying rehearing in the city of Morgan City, which was cited, I believe, January 4th, four days ago, by the appellants. It was joined by Judge Smith. The frustration of purpose prediction, which is what this is about, this is a long-hand version for conflict, the latter part of the conflict preemption, which is the issue should not be allowed to drastically expand, that is, the frustration of purpose preemption should not be allowed to drastically expand a federal lending agency's authority where Congress expressly contemplated it would play by local regulatory rules. I have three minutes left. I'll submit my time. I think we understand your argument, counsel. Thank you very much. Thank you. We provided that citation because I just thought the court needed to see that case because it was so much like the other cases that we had cited. We're fully aware of the dissent that Judge Jones and Judge Smith signed, and we're fully aware of the rejections to obstacle preemption. In that case, it had to do with condemnation of something like 1% of a grounds for federal preemption. Fine. We have no quarrel with that. Their objection was to this loosey-goosey purposes and objectives preemption philosophy that has been applied by some judges at some times. But this one is not loosey-goosey. This statute says it is the policy of Congress not just to have low rates, but these systems should be encouraged and assisted to develop their resources and ability to achieve the financial strength needed to enable them to satisfy their credit needs. Their only financial strength is patronage capital. That is Congress speaking directly. We're not asking for some kind of purposes and objectives implied from either. With respect to the other two cases, the Third Circuit and the Eleventh Circuit, I believe the same argument was made in the Eleventh Circuit. The opinion does not address it. We know the same argument was made in the Third Circuit because it says, the opinion says, plaintiffs claim it would not fully preclude REA from retiring any patronage capital. The Third Circuit, nevertheless, found preemption. In federal question, excuse me, federal officer removal, it says, one of the most important reasons for removal is to have the validity of the defense of an official of the N.R.T. tribe in a federal court. If you apply the ordinary pleading standards to this complaint, it belongs in federal court. It should stay in federal court so that we can show that whatever the result is, it does not contravene any of these federal preemption documents. Thank you. Thank you. We have your argument. This case is submitted.